KUSKIN, J.T.C.
Plaintiff, BASF Corporation, Coating and Ink Division, has appealed the property tax assessments for tax year's 2004, 2005 and 2006 on its property in the Town of Belvidere, Warren County. The property is designated on the Town Tax Map as Block 1, Lots 5, 5.02, 5.03, 5.05 and 28. For each of the years under appeal, the aggregate assessment on the five lots under appeal was $9,500,000 allocated $1,669,650 to land and $7,830,350 to improvements. The Chapter 123 Ratios, determined pursuant to N.J.S.A 54:1-35a to -35c, were 80.58% for tax year 2004, 71.27% for tax year 2005, and 64.04% for tax year 2006. The only proofs as to the value of the subject property were provided by plaintiff, through its appraiser and cost expert. Plaintiffs appraiser determined a value for the subject property of $5,850,000 for tax year 2004, $5,950,000 for tax year 2005, and $5,965,000 for tax year 2006. Defendant’s appraiser, although having prepared an appraisal report, was not called to testify as to the value of the property and limited his testimony to a critique of the land sales analysis by plaintiffs appraiser.
For all years under appeal, the property was used to manufacture paint coatings. That use was permitted in the LM Light Manufacturing zone in which the property was located. The property complied with the bulk requirements of the zoning ordinance.
The subject land is part of a larger parcel comprising some 713 acres located in the Town of Belvidere and adjoining White *554 Township. The portion located in the Town of Belvidere which is the subject of plaintiffs appeals contains 138.45 acres. The land is irregular in shape and has frontage along the Delaware River of approximately 250 feet. The improvements on the property were located on the southwest, generally level, 30 acre portion of Block 1, Lot 5. The remainder of the land in Belvidere, 108.45 acres, was heavily wooded and undeveloped and had a predominantly undulating and sloping topography. The property was not connected to the municipal water supply which lacked capacity to handle the property’s water requirements. Plaintiff obtained water from the Delaware River pursuant to a permit issued by the New Jersey Department of Environmental Protection. Although the permit allowed the diversion of not in excess of 155 million gallons per month (approximately 5,000,000 gallons per day), the actual usage at the property was approximately 30,000 gallons of water per day, all of which was used for non-production purposes, specifically for drinking, washing, and toilets for employees and for the boiler providing heat to the buildings on the property.
On occasion, the property has been affected by flooding of the Delaware River. The flooding has not extended to the buildings and improvements on the property, but the street providing the main access to the property has been flooded and the height of the river has caused the closing of a bridge, thereby precluding access to the property by employees who reside in Pennsylvania. During the years under appeal, the subject plant was closed on three occasions as a result of Delaware River flooding.
The property was improved with multiple older industrial manufacturing buildings and related tanks. Some of the buildings contained more than one story. The original construction took place in 1929, and the facility was enlarged and modified over the years. As of the valuation dates in issue, October 1, 2003, October 1, 2004, and, October 1, 2005, the total building area was 276,498 square feet. The main building at the property was a one- and part two-story structure with a partial basement, containing an aggregate area of 149,461 square feet and was used as the manufacturing area. This building originally was constructed in 1929 with additions in 1951, 1972 and 1987. The second largest *555 building at the property was the one-story shipping warehouse containing 69,500 square feet. This building was constructed in 1977. The other buildings were:
(a) a one-story gatehouse containing 2,074 square feet, constructed in 1945;
(b) a fire pump house, located below grade along the Delaware River, containing 660 square feet, constructed in 1941;
(c) a one-story screen house containing 475 square feet, constructed in 1929;
(d) a one-story pump house and garage containing a total of 3,530 square feet, constructed in 1929;
(e) a one-story water filler house, located along the Delaware River, containing 3,575 square feet, constructed in 1925;
(f) a two-story power house/boiler house containing 10,415 square feet, constructed in 1929;
(g) a one-and part two-story PVAC building containing 13,922 square feet, constructed in 1958;
(h) a six-story solvent building containing 18,606 square feet, constructed in 1955;
(i) a one-story weld shop containing 3,008 square feet, constructed in 1941; and
(j) a one-story sanitary plant containing 480 square feet, constructed in 1925.
The highest and best use of the 30 acre portion of subject property on which the buildings were located, as determined by plaintiffs appraiser, was as a “paint coatings manufacturing facility with several structures not contributing to the property’s market value.” The appraiser concluded that the remaining 108.45 acres of vacant land were “undevelopable [and] should be considered for sale to a government agency for land preservation or for park lands (sic).”
In his valuation analysis plaintiffs appraiser relied solely on the cost approach. This approach consists of two elements: (1) determination of land value and (2) determination of the depreciated reproduction cost or replacement cost of the buildings and improvements. Appraisal Institute, The Appraisal of Real Estate 349-50 (12th ed.2001).[1] I will discuss first the appraiser’s land value analysis.
For purposes of his analysis, plaintiffs appraiser divided the subject property into two sections and determined a separate *556 value for each section. One section consisted of the 30 acres on which the plant facilities were located, and the other section consisted of 108.45 acres of undeveloped land not used by plaintiff. In valuing the 30 acre plant site, the appraiser relied on six comparable sales and determined values of $40,000 per acre as of October 1, 2003, $42,000 per acre as of October 1, 2004, and $44,000 per acre as of October 1, 2005. In valuing the remaining acreage, the appraiser relied on comparable sales different from those he used in valuing the plant site. The appraiser determined values for the 108.45 acres of $5,000 per acre as of October 1, 2003, $5,250 per acre as of October 1, 2004, and $5,500 per acre as of October 1, 2005.
Land sale No. 1 used by the appraiser to value the 30 acre plant site was located in Hackettstown, Warren County and contained 7.08 acres. This property sold on August 1, 2000 for a price of $31,779 per acre. Plaintiffs appraiser described the sale property as being purchased without approvals and subsequently developed with a light industrial/warehouse building, a permitted use under the zoning ordinance. The appraiser testified that he observed, but did not inspect, the building in 2005. Because of the date of the sale, the appraiser used it to value the subject plant site land only for tax- year 2004. After adjustments by him, the sale reflected $34,958 per acre. Testimony by defendant’s appraiser demonstrated that property was not developed as described by plaintiffs appraiser. Defendant’s appraiser obtained from the Hackettstown Planning Board a copy of an application filed in 2006 seeking a use variance to permit construction on the sale property of two office buildings and apartment buildings, uses not permitted under the zoning ordinance. The application described the sale property as “Vacant Land,” thus confirming the absence of the development to which plaintiffs appraiser testified.[2]
*557 Defendant’s appraiser testified that, when a comparable sale without approvals is used to value property that has approvals, such as the subject property, a significant adjustment is necessary. He opined that a 33% positive adjustment would be appropriate when the sale transaction was not contingent on approvals, and that a 25% positive adjustment would be appropriate when the sale transaction was contingent on approvals. Both percentages reflect the probable costs of obtaining approvals, the impact of any time delay involved in doing so, and the risk of a denial of approvals resulting in the purchaser’s having incurred non-reeov-erable costs that produced no benefit. The larger percentage, 33%, also reflects the risk to a purchaser of having purchased property that it cannot use as intended.
Plaintiffs appraiser also testified that an approvals adjustment should be made when a comparable sale without approvals is used to value an approved property. He opined that the adjustment should be between 5% and 15%, with an even higher percentage being appropriate when the required approvals included a use variance or zone change. In his analysis of his plant site comparable sales, however, the appraiser used only a 5% positive adjustment when the comparable lacked approvals.
Although neither appraiser provided any meaningful support for his percentage adjustment, I find the testimony by defendant’s appraiser as to 33% and 25% adjustments to be more persuasive than the testimony of plaintiffs appraiser in support of his 5% adjustments. The larger percentages are more likely to reflect the cost, time, and risk factors discussed above. Factoring a 33% approvals adjustment into the analysis by plaintiffs appraiser of his plant site sale No. 1 (plaintiffs appraiser had used a 5% adjustment) produces a reflected land value of $44,746 per acre for tax year 2004.
Plant site sale No. 2 used by plaintiffs appraiser was located in Greenwich Township in Warren County. The property contained 109.55 acres located in a ROM — Research, Office and Manufacturing zone — and sold on January 31, 2001 at a price of $23,500 per acre. After adjustments by the appraiser, the sale reflected per *558 acre values for the subject land of $30,457 for tax year 2004 and $31,303 for tax year 2005. As noted above, defendant’s appraiser had prepared a report for purposes of these appeals. In that report, he used this sale as a land comparable. Plaintiffs appraiser testified that the sale property sold with approvals for construction of a light industrial/warehouse building containing 555,600 square feet. Defendant’s appraiser, after investigation at the Greenwich Planning Board with respect to the sale, testified that the approvals to which plaintiffs appraiser referred had expired in 1995 and that, at the time of sale, no approvals were in place. Defendant’s appraiser opined that, because of the absence of approvals, a positive 33% adjustment would be appropriate. Plaintiffs appraiser made no adjustment for approvals.
On the basis of the discussion above with respect to the appropriate adjustment for the absence of approvals, I conclude that an adjustment to the sales price of a positive 33% is appropriate, in accordance with the testimony of defendant’s appraiser. After this adjustment is factored into the analysis by plaintiffs appraiser, Sale No. 2 reflects a value for the subject plant site land of $37,564 per acre for tax year 2004 and $41,567 per acre for tax year 2005. Plaintiffs appraiser did not use his Sale No. 2 in valuing the plant site land for tax year 2006.
Plant site sale No. 3 used by plaintiffs appraiser was located in Franklin Township, Warren County. The property contained 69.73 acres and sold on June 20, 2002. The sale was contingent on approval of a zoning variance to permit development of the property with a 288,159 square foot building to be used as a low impact storage facility. The sales price was $8,963 per acre. In connection with obtaining the variance, as well as site plan approval and minor subdivision approval, the purchaser agreed to convey 29.19 acres to Franklin Township for a consideration of $1.00. Plaintiffs appraiser erroneously described the conveyance as comprising 39.73 acres. The purchase price paid for the land, therefore, related only to 40.54 acres retained by the purchaser and translated into a per acre price of $15,417. After applying the adjustments used by plaintiffs appraiser to the correct net sales price, the sale reflected per acre values for the subject property of *559 $17,730 for tax year 2004, $18,971 for tax year 2005, and $19,503 for tax year 2006. Because of the approval contingency to which the sale was subject, I conclude, based on the discussion above, that a positive 25% adjustment is appropriate relating to the contingency. After inclusion of that adjustment in the analysis by plaintiffs appraiser, the sale reflects per acre values for the subject property of $20,813 for tax year 2004, $22,270 per acre for tax year 2005, and $22,894 per acre for tax year 2006.
Plant site land sale No. 4 on which plaintiffs appraiser relied was located in Hackettstown in Warren County. The sale property contained 15 acres and sold in March 2003 for a price of $55,000 per acre. After adjustment by the appraiser, the sale reflected per acre values for the subject property of $53,295 for tax year 2004, $54,863 for tax year 2005, and $56,430 for tax year 2006. Testimony by defendant’s appraiser demonstrated that the sale was contingent on approvals for a warehouse, a permitted use under the applicable zoning ordinance. Because of this contingency, I will include a plus 25% adjustment to the sale price, based on the discussion above. Plaintiffs appraiser made no adjustment for approvals. With the 25% adjustment, the sale reflects a value for the subject land of $67,320 per acre for tax year 2004, $69,300 per acre for tax year 2005, and $71,280 per acre for tax year 2006.
Plant site land sale No. 5 used by plaintiffs appraiser was located in Washington Township, Moms County. The deed for the sale was dated September 17, 2004 and recorded on October 6, 2004. The appraiser considered this sale only for tax years 2005 and 2006. The sale property contained 29.27 acres located in an OR — Office/Research zone. The sale price was $32,776 per acre. After adjustment by the appraiser, the sale reflected per acre values for the subject property of $34,415 for tax year 2005 and $35,448 for tax year 2006. This sale was part of a transaction in which the sale parcel was exchanged for another parcel in Washington Township. The transaction was completed as of September 17, 2004. An application for approval of a large scale (“big box”) retail building containing approximately 135,000 square feet had received preliminary approval on October 22, 2003. Defendant’s appraiser testified that this sale was contingent on the approval. *560 After a positive 25% adjustment for the contingency is applied, instead of the 5% adjustment made by plaintiffs appraiser, the sale reflects a land value for the subject property of $40,970 per acre for tax year 2005 and $42,199 for tax year 2006.
The final plant site land sale used by plaintiffs appraiser was located in White Township in Warren .County. The sale took place on August 10, 2005. Plaintiffs appraiser used this sale only for valuing the plant site land for tax year 2006. The sale property contained 11.64 acres located in a CC — Community Commercial zone. The sales price was $350,000 or $30,069 per acre. After applying the adjustments used by the appraiser, the sale reflected a per acre value for the subject property of $31,572. The sale was contingent on approvals for use as a greenhouse. The zoning ordinance provided that “industrial uses involving any process of manufacture” and warehouses were prohibited uses. Because of the approval contingency, I will apply a positive 25% adjustment as compared to the 5% adjustment made by plaintiffs appraiser. After inclusion of this adjustment, the sale reflects a value for the subject property for tax year 2006 of $39,480 per acre.
The following is a comparison of the analysis by plaintiffs appraiser and my analysis of the per acre value of the subject plant site reflected by each of the plant site sales used by plaintiffs appraiser.
Sale No. Plaintiffs Appraiser Court
1 $34,958 (2004) $44,746 (2004)
2 $30,457 (2004) $37,564 (2004)
$31,303 (2005) $41,567 (2005)
3 $17,730 (2004) $20,813 (2004)
$18,971 (2005) $22,270 (2005)
$19,503 (2006) $22,894 (2006)
$53,295 (2004) $67,320 (2004) 4
$54,863 (2005) $69,300 (2005)
$56,430 (2006) $71,280 (2006)
*561 5 $34,415 (2005) $40,970 (2005)
$35,448 (2006) $42,199 (2006)
6 $31,572 (2006) $39,480 (2006)
Based on the preceding discussion of the sales us'ed by plaintiff’s appraiser, I conclude that his Sale No. 2 is entitled to the most weight. I give his Sales Nos. 1, 3 and 4 less weight. The lot sizes of Sales Nos. 1 and 4, 7.08 acres and 15 acres, respectively, are inadequate to contain the improvements located on the subject property and, therefore, receive less weight than Sale No. 2. Sale property No. 3 had a highest and best use similar to, but somewhat different from, the highest and best use of the subject plant site, and this limits the comparability of the sale.
Sales Nos. 5 and 6 used by plaintiffs appraiser are entitled to no weight. As described above, Sale No. 5 was part of a property exchange. Cf. AT & T Corp. v. Morris Tp., 19 N.J.Tax 319, 324 (Tax 2000) (rejecting a sale of the subject property as evidence of value when the sale was part of a tax free exchange under I.R.C. § 1031). The zoning of the property was for office/research, and the property was developed for a large retail use, all indicating that the highest and best use of the property was other than for a manufacturing/warehousing use. Plant site sale No. 6 also had a different highest and best use from the subject land. The zoning was Community Commercial; industrial uses involving manufacturing and warehousing were prohibited in the zone. The site was developed with a greenhouse. See The Appraisal of Real Estate 60 (noting that comparable land sales that do not have the same highest and best use “are usually eliminated from further analysis”).
My analysis of the sales used by plaintiffs appraiser to value the plant site at the subject property differs from his, but the analysis supports his determination that the value of the subject 30 acre plant site was $40,000 per acre as of October 1, 2003. Consequently I adopt that value for purposes of my valuation determination of the plant site for tax year 2004. For tax years 2005 and 2006,1 accept the testimony of plaintiffs appraiser that a *562 non-compounding 3% per year time adjustment is appropriate. Therefore, for tax year 2005 my plant site land value is $41,200 per acre, and for tax year 2006 my value is $42,400 per acre. These per acre values are slightly lower than the values determined by plaintiffs appraiser of $42,000 per acre for 2005 and $44,000 per acre for 2006, but the values are consistent with my analysis of the appraiser’s plant site land sales.
The second part of the land value analysis by plaintiffs appraiser related to the 108.45 acre portion not required for the subject improvements. In valuing this portion, the appraiser relied on sales different from those he used to value the plant site. The six sales he used to value 108.45 acres were zoned for farmland preservation district use (Sales Nos. 1 and 2) or for residential development (Sales Nos. 3, 4, 5 and 6). The appraiser selected these sales based on his conclusion that the highest and best use of the 108.45 acres was for land preservation or parkland even though: (a) plaintiff presented no proofs that these acres had been dedicated for, or restricted to, a land preservation or parkland use, cf. Village of Ridgeivood, v. Bolger Foundation, 104 N.J. 337, 517 A.2d 135 (1986) (holding that, when a taxpayer grants a conservation easement encumbering its property in perpetuity, the value of the property, for tax assessment purposes, should be reduced because of the existence of the easement), and (b) the acreage was located in the LM Light Manufacturing zone (as was the 30 acre plant site) established by the Belvidere zoning ordinance, and the ordinance expressly prohibited any use in the zone other than light manufacturing offices, office buildings, research institute or laboratory, storage building, or public utility building or structure. In order to constitute a highest and best use, a use must be physically possible, legally permissible, financially feasible, and maximally productive. See The Appraisal of Real Estate 307. “The tests of physical possibility and legal permissibility must be applied before the remaining tests.... A use may be financially feasible, but this is irrelevant if it is legally prohibited or physically impossible.” Ibid.
In seeking to value the 108.45 acre portion of the subject property for a highest and best use different from the uses *563 permitted by the zoning ordinance, plaintiff had the burden of proving that the other use, for land preservation or parkland, constituted the highest and best use. In my opinion in General Motors Corp. v. City of Linden, 22 N.J.Tax 95, 149 (Tax 2005), I discussed both the burden of proof obligation and the requirement that, in order to carry the burden, a party must conduct a market and marketability study. Such a study involves six sequential steps. The first step is a property productivity analysis (which includes consideration of zoning), then a market delineation, followed by a demand analysis and forecast, a competitive supply analysis and forecast, a supply and demand study, and finally a capture estimate, that is, a determination of the share of the total demand for a particular use likely to be captured by the property. The Appraisal of Real Estate 286. Plaintiffs appraiser made no such analysis. He reached his highest and best use conclusion as to the 108.45 acre portion of the subject property based merely on the absence of nearby industrial development and an inferred absence of demand for development of the acreage as zoned. He then assumed that his alternate highest and best use would be permitted under the zoning ordinance.
An assumption that use of a property other than as zoned will be permitted is insufficient. Proof of a reasonable probability that an alternate use would be approved is required. See Hoechst Celanese Corp. v. Bridgewater Tp., 12 N.J.Tax 532, 539 (Tax 1992) (stating that “property must be valued in its existing zoned use unless there is a probability of a change in zoning”). See also State v. Caoili, 135 N.J. 252, 264-65, 639 A.2d 275 (1994) (holding that a change in zoning may be considered in valuing property only if the evidence establishes that the change is reasonably probable). Plaintiff presented no such proof, and, as a result, failed to demonstrate that a use of the subject property other than as zoned had “a probability of achievement.” Ford Motor Co. v. Edison Tp., 127 N.J. 290, 301, 604 A.2d 580 (1992). Proving that the 108.45 acres had not been developed for many years and might remain undeveloped for a number of years is not equivalent to proving the likelihood of change in the zoning applicable to the *564 acreage or the likelihood of a variance permitting a use otherwise expressly prohibited by the zoning ordinance.
Plaintiff argues that use for land preservation or parkland is always permitted even if not set forth in a zoning ordinance as a permitted use. Plaintiff cites no authority in support of its argument, and my research has not disclosed any reported cases that support the argument. The position of the Appraisal Institute is that “public interest value,” that is, a value based on a highest and best use for “non-economie uses such as conservation or preservation,” is inappropriate and inapplicable “when the purpose of the appraisal is to estimate market value.” The Appraisal of Real Estate 649-50.
Just as proving that the subject 108.45 acres had not been developed and might remain undeveloped for a number of years does not equal proving that a zone change or use variance is likely, so, too, proving past inactivity on the property, combined with predictions of continued inactivity unsupported by a market and marketability study, do not equal proving that the highest and best use of the property is, in effect, non-use. Limited market demand may warrant holding a property for future development. This may constitute an interim use[3] of the property, but, in any event, “the current value of the land is a function of its future highest and best use, so the appraiser should discuss its potential highest and best use.” Id. at 325. The exact future use of the property may not be predictable with certainty, “but the general type of future use (e.g. as a shopping center or industrial park) is often known or anticipated by the zoning, surrounding land-use patterns, or comprehensive city plan.” Ibid. Plaintiffs appraiser made none of the analysis suggested by the foregoing quotations from The Appraisal of Real Estate. His failure to do so provides another basis for my rejection of his opinion as to the highest and best use of the subject 108.45 acres.
*565 As a result of plaintiffs failure to prove that land preservation or parkland was the highest and best use for the 108.45 acre portion of the subject property, I conclude that the highest and best use of these acres was, as zoned, for industrial development similar to the highest and best use of the adjoining 30 acre plant site. Each of the comparable sales selected by plaintiffs appraiser to value the 108.45 acres had a highest and best use other than, and unrelated to, industrial development. When a comparable sale has an entirely different highest and best use from the highest and best use of the subject site as vacant, “the transaction does not qualify as a comparable sale and should be dismissed from further consideration in the analysis of the subject property.” The Appraisal of Real Estate 334. Consequently, the comparable sales on which the appraiser relied are not probative of the value of the 108.45 acres.[4]
For all of the foregoing reasons, I find and conclude that plaintiff failed to prove a per acre value for the 108.45 acres different from the per acre value of the 30 acre plant site.
Defendant’s appraiser acknowledged, in his limited testimony, that, because of the limited market demand for development of the 108.45 acres for industrial purposes, this portion of the subject property should be valued on a somewhat different basis from the plant site. He suggested that one method of differentiating between the two portions of the property would be to use the same comparable sales to value both, but, in valuing 108.45 acre portion (which had no approvals), use an adjustment for approvals different from the adjustment used in valuing the 30 acre plant site (which had approvals). The appraiser, however, did not actually perform this analysis.
I conclude that a reasonable basis for valuing the 108.45 acre portion of the subject property can be derived from the testimony of plaintiff’s appraiser and defendant’s appraiser that an adjust *566 ment for approvals is appropriate when using comparable sales without approvals in order to value property with approvals. As discussed above, plaintiffs appraiser, although he used only a 5% approvals adjustment, testified that the proper adjustment was between 5% and 15% with a higher percentage being appropriate if the approvals included a use variance or zone change. Defendant’s appraiser testified that, for property sold with no approvals, a 33% positive adjustment to the sale price was appropriate. The four comparable sales that plaintiffs appraiser used to value the subject plant site for tax year 2004 all sold without development approvals, although Sales Nos. 3 and 4 were contingent on approvals.
If I eliminate any approvals adjustment from the analysis of the four sales by plaintiffs appraiser, the sales reflect per acre values of $33,210, $30,457, $16,959, and $53,295, respectively. Giving most weight to Sale No. 2 and less weight to the others results in an estimated per acre value for the 108.45 acres of $28,000 to $30,000. Applying the analysis by defendant’s appraiser in order to differentiate the 108.45 acres, without approvals, from the 30 acre plant site portion of the subject property, with approvals, requires a 33% reduction in my October 1, 2003 value of $40,000 per acre for the plant site land in order to account for the absence of approvals for the 108.45 acres. This produces a value of $26,800 per acre. I am satisfied from the evidence that no immediate demand for development of the acreage, as zoned, existed as of the relevant assessment dates. This absence of demand and the risk that demand would not arise for an extended period of time must be taken into account by an additional negative adjustment to value. On the basis of the preceding discussion, I conclude that a fair and reasonable value for the 108.45 acres at the subject property is $20,000 per acre for tax year 2004. Applying a 3% per year non-compounding time adjustment, in accordance with the testimony of plaintiffs appraiser, produces values of $20,600 per acre for tax year 2005, and $21,200 per acre for tax year 2006.
Based upon the preceding analysis, the land at the subject property has the following values:
*567 Tax Year 2004
30 A. x $40,000/A. = $1,200,000
108.45A. x $20,000/A = $2,169,000
Total $3,369,000.
Tax Year 2005
30A. x $41,200/A = $1,236,000
108.45A. x $20,600/A = $2,234,100
Total $3,470,100
Tax Year 2006
30A. x $42,400/A. = $1,272,000
108.45A. x $21,200/A. = $2,299,100
Total $3,571,100.
In valuing the buildings and improvements at the subject property, plaintiffs appraiser relied on a cost expert to determine the reproduction cost new of the subject facilities and the physical depreciation applicable to those facilities. “Reproduction cost” is defined as “the estimated cost to construct at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout and quality of workmanship, and embodying all the deficiencies, superadequacies and obsolescence of the subject building.” The Appraisal of Real Estate 358. After reviewing sixty-three construction drawings and making several field inspections, the cost expert performed his reproduction cost analysis using the quantity survey method. This method involves a determination of (1) the quantity and quality of all materials and labor used to construct each building and improvement, and (2) the cost of each. See The Appraisal of Real Estate 379 (describing the quantity survey method). The expert used the computer software version of the Means Assemblies Cost Data Manual for 2006 as the source for his cost determinations for each building and improvement.
The cost expert used the 2006 manual because the data was collected during the last quarter of calendar 2005. He adjusted all *568 costs by using a location modifier for Dover, New Jersey which he determined was closer to the subject property than any other geographical location for which modifiers were provided in the Manual. In his analysis, the expert excluded piping and wiring connecting manufacturing equipment. He added sales tax on materials, but not on labor, using the 6% sales tax rate then in effect. He assumed that the costs of materials consisted of 50% for the materials themselves and 50% for labor. In order to adjust his reproduction cost for tax years 2004 and 2005, he used a trending analysis based upon information provided in the Means Manual.
The cost expert determined a 2006 total reproduction cost new for the subject buildings and improvements of $29,031,105 consisting of the following:
Hard Cost (buildings) $17,854,777
Hard Cost (site improvements) $ 2,733,586
$20,588,363
Add 2% for contingencies 411,767
$21,000,130
Add 10% for general conditions 2.100.013
$23,100,143
Add 10% general contractor’s overhead 2.310.014
$25,410,157
Add 14.25% for soft costs 3,620,978
TOTAL $29,031,105.
The soft costs comprised architectural fees of 4.25%, legal and accounting fees of 2%, and construction loan interest of 8%. The percentages the expert used for contingencies, general conditions, general contractor overhead, and soft costs were derived either from the Means Manual or from his market investigations. Based on a trending analysis using the Means Manual, he determined reproduction costs new for tax years 2004 and 2005 in the following amounts.
*569 2004 - Buildings $22,268,658
Site Improvements 3,409,360
TOTAL $25,678,018
2005 - Buildings $23,842,192
Site Improvements 3,650,270
TOTAL $27,492,462.
In addition to determining the reproduction cost new of the subject buildings and site improvements, plaintiffs cost expert also made an analysis of physical depreciation applicable to each of the buildings and site improvements. In doing so, the appraiser relied on tables compiled by Marshall & Swift (Marshall Valuation Service) relating to the normal useful lives of buildings and site improvements. He also determined the remaining useful life for each of the buildings based on his inspection of the property. He calculated physical depreciation by multiplying the reproduction cost for a particular building or improvement by a fraction, the numerator of which was the remaining useful life of the building or improvement, and the denominator of which was the useful life of the building or improvement as shown in the Marshall & Swift tables. His overall physical depreciation percentage for buildings was 66.57% for tax year 2004, 68.57% for tax year 2005, and 70.57% for tax year 2006. As to site improvements, his overall percentage of physical depreciation was 64.73% for tax year 2004, 67.8% for tax year 2005, and 70.46% for tax year 2006. Based on his analysis, the cost expert determined reproduction costs new, less physical depreciation, for the buildings and improvements (including site improvements) at the subject property in the following amounts:
2004— $8,647,134
2005— $8,669,171
2006— $8,548,382.
I find and conclude that the analysis by plaintiffs cost expert is a reliable estimate of the reproduction cost new of the subject facility, including the buildings and site improvements, and of the physical depreciation applicable to the buildings and site improve *570 ments. As noted previously, defendant presented no testimony with respect to the value of the subject property, and no testimony as to reproduction cost new or physical depreciation. Cross-examination of plaintiffs cost expert did not reveal any significant flaws in his analysis. Plaintiffs appraiser accepted and adopted the calculations by the cost expert, and I accept and adopt them as well. Consequently, I find and conclude that the reproduction cost new, less physical depreciation, for the subject property was as follows: for tax year 2004-$8,647,134, for tax year 2005— $8,669,171 and for tax year 2006-$8,548,382.
In making his determination of reproduction cost new for the subject property, plaintiffs appraiser intentionally omitted any entrepreneurial profit or entrepreneurial incentive. As defined in The Appraisal of Real Estate, “entrepreneurial profit is the difference between total cost of development and marketing and the market value of a property after completion and achievement of stabilized occupancy and/or income.” Id. at 360-61. Entrepreneurial incentive is “the amount an entrepreneur expects to receive as compensation for providing coordination and expertise in assuming the risks associated with the development of a project.” Id. at 360. Plaintiffs appraiser opined that, for a property such as the subject, which was originally designed as a manufacturing and processing plant and then modified over time, the motivation to build does not include an anticipated return on, or profit from, a sale or lease of the property.
Both entrepreneurial profit and entrepreneurial incentive are “market derived figures.” The Appraisal of Real Estate 361. Because defendant has not provided any evidence as to whether entrepreneurial profit or incentive should be included in valuing the subject property by the cost approach, I have no basis in the record to determine what amount of incentive or profit would be appropriate. Consequently, I am compelled to accept the conclusion of plaintiff’s appraiser that no entrepreneurial profit or incentive should be added to the reproduction cost new of the subject property.
*571 Although plaintiff’s appraiser relied on the determinations by plaintiff’s cost expert as to the reproduction cost new and physical depreciation for the buildings and improvements at the subject property, the appraiser made an independent analysis of functional obsolescence and external or economic obsolescence at the property. I turn now to a discussion of this analysis.
Functional obsolescence is defined in The Appraisal of Real Estate as follows:
Functional obsolescence Is caused by a flaw in the structure, materials, or design of the improvement when compared with the highest and best use and most cost-effective functional design requirements at the time of appraisal. A building that was functionally adequate at the time of construction can become inadequate or less appealing as design standards, mechanical systems, and construction materials change over time. Functional obsolescence is attributable to defects within the property, while external obsolescence is caused by external factors. Functional obsolescence, which may be curable or incurable, can be caused by a deficiency, which means that, some aspect of the subject properly is below standard in respect to market norms. It can also be caused by a suporadequaey, which means that some aspect of the subject property exceeds market norms. [The Appraisal of Real Estate 403]
Plaintiffs appraiser determined that the functional obsolescence at the subject property resulted from a superadequacy and from excess costs for utilities, personnel, and maintenance attributable to the superadequacy. The appraiser concluded as follows with respect to the superadequacy:
The subject property consists of 276,498 plus or minus square feel, of which portions of the square footage are considered dead or idle space or non-usable areas that do not contribute to the manufacturing operations of the facility. In addition, areas of the manufacturing buildings are hindered by their low ceiling heights, which does not allow for the installation of modern equipment.
In order to calculate the functional obsolescence attributable to the superadequacy, the appraiser compared the reproduction cost (defined above) of the subject facility (buildings and site improvements) with its replacement cost, relying on the determinations of reproduction cost and replacement cost by plaintiffs cost expert. “Replacement cost” is defined as “the estimated cost to construct at current prices as of the effective appraisal date, a building with utility equivalent to the building being appraised, using modem materials and current standards, design, and layout.” The Appraisal of Real Estate 358. The cost expert made his determina *572 tion of the replacement cost of the subject facility by first calculating the replacement cost of a facility operated by plaintiff in Windsor, Canada. In doing so, he reviewed a site plan and eight sheets of general layout drawings for the Windsor facility and relied on information provided by a staff engineer at the subject property who had visited the facility. The expert concluded that the Windsor plant contained 120,588 square feet of building area, was substantially renovated in 1995, was engaged in essentially the same manufacturing process as conducted at the subject property, produced 3,200,000 gallons per year of paint coatings, and that 60% of the square foot area of the facility was devoted to warehouse and office use and the remaining 40% was devoted to manufacturing purposes. From the 2006 edition of the Means Building Construction Cost Manual, he derived a replacement cost for the Windsor facility of $61.44 per square foot for the warehouse/office area and $70.85 per square foot for the manufacturing area, with both costs including site work.
As the next step in his analysis, plaintiffs cost expert determined that, if the Windsor facility could produce 3,200,000 gallons of paint coatings annually in an area of 120,588 square feet of manufacturing, warehouse, and office space, then the amount of space required to produce 5,500,000 gallons per year (the production level at the subject property), in a facility similar in design to the Windsor facility, was 207,547 square feet, or 68,951 square feet smaller than the 276,498 square foot area of the subject buildings. Then, using the replacement cost he determined for the Windsor facility, the cost expert calculated an October 1, 2005 replacement cost of $19,654,837 for a facility of similar construction and design but containing 207,547 square feet (allocated 60% to warehouse and office use and 40% to manufacturing) and located in Belvidere, New Jersey. This cost included site work, hard costs, contingencies, general conditions, general contractor overhead and profit, and soft costs.
Based on the cost expert’s calculation that 207,547 square feet was the appropriate size for a plant replacing the subject facility, plaintiffs appraiser concluded that 68,951 square feet of the subject buildings constituted excess area or a superadequacy. In *573 order to determine the functional obsolescence to be deducted as a result of this superadequacy, the appraiser compared the $29,031,101 October 1, 2005 reproduction cost of the subject facility with its October 1, 2005 replacement cost, that is, $19,654,837 (the cost of a 207,547 square foot Windsor-like facility located at the subject site.) Dividing the replacement cost by reproduction cost produced a ratio of .677. This meant that the cost of a more modern facility, without the superadequate area of 68,951 square feet, was 67.7% of the reproduction cost of the existing facility. The appraiser multiplied 67.7% times $8,548,382, his 2006 reproduction cost new less physical depreciation for the subject buildings and improvements. He opined that the product of this multiplication, $5,787,254, represented the 2006 reproduction cost of the subject property, less physical depreciation and less functional obsolescence attributable to the superadequacy. For tax year 2004, the amount similarly calculated was $5,854,110, and, for tax year 2005, the amount was $5,869,029.
Plaintiff’s appraiser then analyzed, as another element of functional obsolescence, additional utility, personnel, and repair and maintenance costs resulting from the superadequacy. As part of this analysis, the appraiser determined that the costs for natural gas service, electric service, and water at the subject facility would be reduced by 25% if the facility were reduced in size by 68,951 square feet (which equaled 25% of the existing area of the subject buildings). The appraiser also determined, based on information provided to him by a staff engineer at the subject property, that, if the building square footage were reduced by 25%, the number of personnel necessary to operate the property could be reduced by four, one of whom would be a member of the maintenance staff. Finally, the appraiser concluded that, if the ceiling heights and layout inefficiencies at the subject property were eliminated (assuming replacement with a modern facility similar to the Windsor plant), the number of forklifts required to transfer and handle materials at the subject property would be reduced from twelve to eight. He calculated the savings in repair and maintenance costs resulting from that reduction.
*574 After determining that $249,559 per year, after taxes, was the aggregate amount of savings resulting from his analysis of reduced consumption of natural gas, electricity, and water, reduction in personnel, and a reduced number of forklifts, the appraiser multiplied that amount by a present value factor of 6.1446 (calculated based on a ten year period and a 10% interest rate), producing in an indicated functional obsolescence of $1,530,000 (rounded). For each year under appeal, he subtracted this amount from reproduction cost as already reduced by subtraction of physical depreciation and functional obsolescence attributable to the superadequacy in the building size, and thereby determined a reproduction cost new, less physical depreciation and all functional obsolescence, of $4,324,110 for tax year 2004, $4,339,029 for tax year 2005, and $4,257,255 for tax year 2006.
I conclude that the analysis by plaintiffs appraiser of functional obsolescence resulting from a superadequacy is flawed and unreliable. Initially, I note that, although the methodology used by the appraiser has been recognized as appropriate in at least one appraisal article and in at least one court decision,[5] the methodology is not consistent with the methodology set forth in The Appraisal of Real Estate. The text describes functional obsolescence caused by a superadequacy as either curable (where the cost of removal of the superadequacy is less than the value added by the removal) or incurable (where the cost to cure would exceed *575 any value increment resulting from the cure). Id. at 404. For a curable superadequacy, the prescribed method of calculating the resulting functional obsolescence is the following:
1) determine the reproduction cost of the superadequate item;
2) subtract physical depreciation;
3) add the cost to cure or additional costs of ownership (for example, excess operating costs) attributable to the superadequacy;
4) subtract the cost if installed new; and
5) the result is depreciation from functional obsolescence.
[Id. at 410.]
If the superadequacy is incurable, neither the cost to cure (part of Item 3) nor the cost if installed new (Item 4) need be considered. Id. at 411-12. Plaintiffs appraiser gave no explanation as to why he did not employ this methodology, and plaintiff provided no analysis using the methodology. The record does not contain an adequate basis for me to make the analysis.
For purposes of this opinion, I accept the methodology used by plaintiffs appraiser as appropriate for determining functional obsolescence due to an incurable superadequacy. However, I reject the appraiser’s analysis because it was based solely on the calculation of the replacement cost for the Windsor facility made by plaintiffs cost expert who did not inspect the facility, did not review any construction drawings for the facility, did not examine photographs of the facility, and reviewed only a site plan and eight layout drawings of the Windsor buildings but no construction drawings.[6] As a result, the cost expert lacked adequate knowledge of the details of the construction of the Windsor facility to determine an accurate replacement cost, or even determine the area of the facility, and thus his replacement cost analysis is unreliable.
The cost expert accepted and utilized, without question, information as to the Windsor facility provided by a staff engineer at the subject property whose knowledge of the facility was limited *576 and inaccurate. The deficiencies in the engineer’s knowledge were indicated by his testimony describing the Windsor manufacturing buildings as one story buildings having “mezzanines in a few spots ... just for access to the tank tops for maintenance.” The layout plans for the manufacturing buildings show that the mezzanine in Building No. 2 had an area one-third or more of the ground floor area of the building, the mezzanine in building No. 3 had an area equal to that of the ground floor, and building No. 4 had a full upper level containing, among other facilities, a control room, computer room, and dispensing room.
Because of the inadequate and inaccurate knowledge of plaintiffs staff engineer on which plaintiffs cost expert relied, and because the cost expert had no direct personal knowledge as to the buildings at the Windsor facility, the expert’s selection of median per unit replacement cost from the Means Manual is unreliable. See The Appraisal of Real Estate 373 (stating that, in order to develop “dependable unit cost figures, an appraiser must exercise judgment and carefully compare the subject building with similar’ or standard structures for which actual costs are known”). In order to select an appropriate cost, the expert required, at the very least, accurate information as to the number of stories in each building at the facility and as to the quality and the particular construction features and characteristics of each building. He did not have that information. He assumed, without knowing, that one-half of the Windsor buildings were of higher quality than the median and one-half were of lower quality. He also assumed that all of the Windsor buildings were pre-engineered metal clad structures, but plaintiffs staff engineer testified that only the manufacturing buildings were of this construction.
Due to the deficiencies in his knowledge of the Windsor facility, the cost expert could not determine replacement cost for the Windsor facility using a methodology comparable in detail and thoroughness to the quantity survey methodology he used to determine the reproduction cost for the subject facility. He used a comparative unit methodology that was far less precise. See The Appraisal of Real Estate 371 (describing the comparative unit method as “relatively uncomplicated, practical, and widely used”) *577 and 379 (describing the quantity survey method as the “most comprehensive and accurate method of cost estimating”). The lack of precision was exacerbated by the nature of the information contained in the Means Manual from which the expert determined the replacement cost of the Windsor buildings. The manual contained only two categories of building types that the expert could use, namely, manufacturing and warehouse/office. These general categories cannot and do not take into account the particular characteristics and features of the Windsor buildings.
The unreliability that characterizes the replacement cost estimates by plaintiff’s cost expert extends to his determination (and unquestioning acceptance by plaintiffs appraiser) that the aggregate area of the Windsor buildings was 120,588 square feet. The site plan for the Windsor facility, that the cost expert reviewed, does not support this determination. Under the heading “Site Data,” the site plan sets forth “Existing Buildings Area Coverage” as 11,203 square meters or 120,588 square feet. The use of the term “coverage” indicates a description of the footprint of the buildings and not their total floor area. See Appraisal Institute, The Dictionary of Real Estate Appraisal 70 (4th ed.2002) (defining “coverage” as “[t]he proportion of the net or gross land area of a site that is occupied by a building or buildings”).
The eight general layout drawings that the cost expert also reviewed show, as described above, that two of the Windsor manufacturing buildings had substantial mezzanines used in the production process, and another manufacturing building had two stories. The drawings also show that the warehouse building had a mezzanine. The cost expert had no plans, not even general layout plans, for any of at least twelve other buildings clearly identified on the site plan for the Windsor facility, and thus could not know whether any of these buildings contained multiple stories. As a result the expert could not know whether the Existing Buildings Area Coverage of 120,588 square feet set forth in the site plan referred to building footprint (as the description indicates) or to total building area. I conclude, based on the layout drawings, that the aggregate floor area most likely exceeds by a *578 significant amount the 120,588 square foot area used by the expert.
The validity of the analysis by plaintiffs appraiser of functional obsolescence due to a superadequacy stands or falls on the accuracy and reliability of the calculations by plaintiffs cost expert (on which the appraiser relied) and on the accuracy and reliability of appraiser’s knowledge of the Windsor facility. I find and conclude that (1) the cost expert lacked sufficient accurate information concerning the construction and area of the Windsor facility, and, consequently, his computation of the replacement cost of the facility is not reliable, and (2) plaintiffs appraiser not only based his analyses on unreliable information but also misunderstood the nature of the Windsor facility. The appraiser testified that the facility consisted of one major building and a few minor shed-like buildings. The Windsor site plan reveals that the manufacturing building is separate from a warehouse building containing approximately 25,000 square feet of ground floor area plus a mezzanine, and that, among the other separate buildings, were an administrative/laboratory building containing approximately 6500 square feet of ground floor area and an office building containing approximately 2700 square feet of ground floor area.
For the foregoing reasons, I reject the determination by plaintiffs appraiser of functional obsolescence due to a superadequacy and will make no deduction for this category of functional obsolescence.
I turn now to the functional obsolescence attributed by plaintiffs appraiser to excess utilities, personnel, and maintenance costs resulting from the superadequate size of the subject buildings. In his analysis, the appraiser assumed that the actual costs at the subject property for natural gas, electricity, and water would be reduced by 25% if the facility were replaced by a more modern facility containing 25% less building area. The record contains no proofs, however, that these reductions would in fact result. The appraiser’s assumption is faulty because, as previously described, as of the valuation dates in issue, not all 276,498 square feet of the subject’s building area were being used or were *579 consuming electricity or natural gas. Therefore the actual natural gas and electricity costs that were the starting point for the appraiser’s analysis reflect costs for operation of only parts of the subject building. The water costs on which the expert relied were incurred for water used by employees for drinking, washing, and toilets, and for water used in the boiler providing heat to the facility. The record contains no proof that replacement of the subject facility with a more modern, 25% smaller, facility would result in a 25% reduction in the workforce or in the area being heated.
Based on the preceding analysis, I conclude that the functional obsolescence attributed by the appraiser to natural gas, electricity, and water savings is unsupported and unreliable. Therefore, I reject any deduction relating to these items.
Plaintiff’s appraiser, using information he attributed to plaintiffs staff engineer, also assumed that the replacement of the subject facility with the hypothetical facility would result in a one-person reduction in the maintenance staff and assumed that, because of more efficient handling of raw materials, manufacturing personnel could be reduced by three. Although plaintiffs staff engineer testified as to possible personnel reductions in a hypothetical smaller, more modern, plant, his testimony contained no specific support for the staff reductions assumed by plaintiffs appraiser, nor did he testify to any analysis he had performed as to personnel requirements in the hypothetical plant. Consequently, the reductions in personnel assumed by plaintiffs appraiser are unsupported, and I find them to be an unreliable basis for functional obsolescence.
Finally, the appraiser calculated functional obsolescence based on a reduction in the number of forklifts from twelve to eight in a one level replacement facility having higher ceilings than those at the subject buildings. Plaintiffs staff engineer testified that the forklifts used under those circumstances would be larger and have greater capacity than the smaller forklifts used at the subject buildings. Neither plaintiffs appraiser nor staff engineer made any attempt to compare the cost of eight larger forklifts with *580 twelve smaller forklifts, or to compare the estimated repair and maintenance costs for the larger forklifts with the costs incurred to maintain and repair the existing forklifts. I conclude, therefore, that the deduction of functional obsolescence related to this item is unsupported and unreliable, and I reject it.
I turn next to the external obsolescence deducted by plaintiffs appraiser in his analysis of the market value of the subject property. The Appraisal of Real Estate defines external obsolescence as “a loss in value caused by factors outside a property. It is often incurable.” Id. at 412. The text describes the three primary methods of measuring external obsolescence as: 1) allocation of market-extracted depreciation; 2) market data analysis; and 3) determination of an income loss caused by the outside factors affecting the property and capitalization of that loss. Ibid.
In his analysis of external obsolescence (to which he refers as economic obsolescence), plaintiffs appraiser cites, as the bases for his deduction, the following factors:
1) the location of the subject property within a residential neighborhood that has resulted in limitations on noise produced at the subject property, particularly a limitation on the hours of truck deliveries, prohibition of truck engine idling in the parking lot, and restriction of the hours of the operation of forklifts outside the plant building;
2) the limited truck route access available in the municipality with trucks being allowed to enter and exit via one roadway, causing delays in shipping and deliveries;
3) the absence <,. a connection to municipal water and the use of river water at a cost in excess of what municipal water would cost; and
4) occasional flooding from the Delaware River which results in a shutdown of the plant or precludes employees living in Pennsylvania from getting to the plant.
The testimony of plaintiffs staff engineer failed to demonstrate any meaningful or measurable detrimental effects from the foregoing factors. The engineer testified that no study had been made as to any increase in costs of operation resulting from the restrictions on delivery hours and the use of forklifts. He testified as to some inconvenience from the limited access to the plant and the occasional flooding of the roadway from the Delaware River (the plant itself has never been flooded), but did not describe any significant disruption of the operations of the subject facility *581 resulting from these limitations. On rare occasions, flooding has forced brief closure of the plant, but the engineer did not describe those closures as having a material impact on overall plant operations.
Plaintiff has owned and operated the subject plant for some twenty-two years. I infer that, whatever the inconveniences that may have resulted from the factors cited by plaintiffs staff engineer and appraiser, those factors were not important enough to deter plaintiff from acquiring the subject facility or from continuing to operate and improve it. I conclude, therefore, that plaintiff failed to demonstrate the existence of external obsolescence that had any measurable effect on the subject property, and no deduction for external obsolescence is appropriate. Although the appraiser’s deduction was only 5% of the building and improvement costs after deductions for physical depreciation and functional obsolescence, even this relatively nominal amount is unsupported by the record, and, consequently, I reject it.
. Based on the preceding discussion and analysis, I find and conclude that the value of the subject property was as follows for each of the year's under appeal.
For Tax Year 2004
Land $ 3,369,000
Improvements $ 8,647,134
Total $12,016,134
For Tax Year 2005
Land $ 3,470,100
Improvements $ 8,669,171
Total $12,139,271
For Tax Year 2006
Land $ 3,571,100
Improvements $ 8,548,382
Total $12,119,482
Under N.J.S.A 54:51A-6a, an assessment reduction is warranted when the ratio of the assessed value of a property to its true *582 value exceeds the upper limit of the common level range. The common level range is defined in N.J.S.A. 54:l-35a(b) as “that range which is plus or minus 15% of the average ratio” for the municipality.
For tax year 2004 the Chapter 123 ratio was 80.58%, the upper limit of the common level range was 92.67%, and the lower limit was 68.49%. The ratio of the assessed value of the subject property to the true value I have determined was 79.6% and thus within the common level range. Consequently, I affirm the 2004 assessment on the subject property of $9,500,000, allocated $1,669,650 to land and $7,830,350 to improvements.
For tax year 2005, the Chapter 123 ratio was 71.27%, the upper limit of the common level range was 81.96%, and the lower limit was 60.58%. The ratio of assessed value to true value was 78.26%, and thus within the Chapter 123 common level range. Consequently, I affirm the 2005 assessment on the subject property of $9,500,000, allocated $1,669,650 to land and $7,830,350 to improvements.
For tax year 2006, the Chapter 123 ratio was 64.04%, the upper limit of the common level range was 73.65%, and the lower limit was 54.43%. The ratio of assessed value to true value was 78.39%, which exceeds the upper limit of the range. Consequently, I will reduce the 2006 assessment on the subject property to $7,761,300, ($12,119,482 times the Chapter 123 ratio of 64.04%), allocated $1,669,650 to land and $6,091,650 to improvements.
Judgments will be entered in accordance with the preceding conclusions.

 All references to The Appraisal of Real Estate throughout this opinion are to the Twelfth Edition published in 2001.

 Attached to the application was a copy of a planning board resolution dated November 24, 2002 granting preliminary and final site plan approval with a variance for construction on the property of a 182,000 square foot manufacturing facility. The applicant was Hackettstown 15 LLC. The relationship of this entity to the sale property was not explained. Apparently, the approved development never occurred.

 An interim use is "the use to which a site ... is put until it is ready for its future highest and best use," usually for a period not exceeding five to seven years. The Appraisal of Real Estate 323-24.

 I note that four of the comparable sales on which plaintiff's appraiser relied apparently had residential development as their highest and best use, and, therefore, would be inappropriate comparables to value the 108.45 acres even for a land preservation or parkland highest and best use.

 In its post-trial brief, plaintiff provided copies of the following article and opinion which discuss the use of a comparison of reproduction cost with replacement cost to determine functional obsolescence due to a superadequacy: Donald J. Hartman & Michael B. Shapiro, Depreciation: Incurable Functional Obsolescence and Sequence of Deductions, Appraisal Journal 408 (July 1983); Mirant New York, Inc. v. Town of Stony Point Assessor, 13 Misc.3d 1204(A), 824 N.Y.S.2d 756 (Sup.Ct.2006) (a slip opinion not published in the official New York reports). Plaintiff also provided a copy of the opinion of the Oregon Tax Court in Department of Revenue v. Grant Western Lumber Co., 2000 WL 1774128 (Or. Tax Nov. 22, 2000), where the court mentions, but does not discuss, the methodology. See also Consolidated Edison Co. of N.Y., Inc. v. City of New York, 8 N.Y.3d 591, 838 N.Y.S.2d 458, 869 N.E.2d 634, 636 (2007) (accepting a calculation of functional obsolescence based on "excess construction costs" but cautioning that such a calculation may not be appropriate in every tax appeal where reproduction cost new less depreciation is the method of valuation).

 As described above, for purposes of determining the reproduction cost of the subject buildings, the cost expert made a detailed inspection of the subject property and reviewed at least sixty-three detailed construction drawings.