LESTER J. DWORMAN, L.J.D. ENTERPRISES, INC., THE DWOR-
MAN COMPANY OF N. J. AND CHASE MANHATTAN MORT-
GAGE AND REALTY TRUST, PLAINTIFFS, v. BOROUGH OF
TINTON FALLS, (BOROUGH OF NEW SHREWSBURY), DE-
FENDANT.

Tax Court of New Jersey

August 28, 1980.

*Irving C. Marcus, Lasser, Hochman, Marcus, Guryan & Kuskin,* for plaintiffs.

*Leo Rosenblum, Rosenblum & Rosenblum,* for defendant.

ANDREW, J. T. C.

The single issue involved in this proceeding requires a determination of the market value of plaintiffs' property for the tax years of 1974, 1975 and 1976. This matter was previously heard by a Judge of the Division of Tax Appeals who determined value based entirely upon the cost approach. He also found inequality in assessment and applied an average of the Director of the Division of Taxation's sales–assessment ratios for 1973, 1974, 1975 and 1976 to eliminate this discrimination.

Both parties appealed from the Division of Tax Appeal's judgments. The Appellate Division affirmed the finding of

discrimination in assessment but indicated that the sales–assessment ratio for 1973 should not have been utilized since the 1973 tax year was not in issue. The Appellate Division also affirmed a finding that the subject improvement was 70% complete as of October 1, 1973 and should be valued at such percentage for the tax year of 1974.

However, the Court was not convinced that the trial judge's total reliance upon the cost approach and rejection of the income approach to value was justified by the record. Therefore, this case was remanded to the Tax Court for a redetermination of the market value of the subject property for the tax years of 1974, 1975 and 1976.

It should be noted that the Appellate Division indicated that while the subject building had some "special features" it constituted an office building and would have general market value as such.

The parties to this matter have stipulated that the common level or ratio to be applied to any determination of true value by this court would be 78.04% representing the average of the Director of the Division of Taxation's ratios for 1974, 1975 and 1976. The parties also understood that the value of the improvements for 1974 would be 70% of the full true value.

The assessments, the action of the Monmouth County Board of Taxation and the judgments of the Division of Tax Appeals were as follows:

| 1974 | Orig. Assessment | County Bd. Action | Div. of Tax Appeals Judgment |
|------|------------------|-------------------|------------------------------|
| Land | $ 119,000 | $ 119,000 | $ 119,000 |
| Improvements | 12,508,600 | 12,508,600 | 9,091,798 |
| Total | $12,627,600 | $12,627,600 | $ 9,210,798 |

| 1975–1976 | Orig. Assessment | County Bd. Action | Div. of Tax Appeals Judgment |
|---|---|---|---|
| Land | $ 119,000 | $ 119,000 | $ 119,000 |
| Improvements | 14,846,000 | 14,846,000 | 13,039,284 |
| Total | $14,965,000 | $14,965,000 | $13,158,284 |

The property consists of 40 acres of land improved with a six–story and basement office building containing a gross area of 727,520 square feet and a net usable area of 612,860 square feet. The subject is located in the northwesterly portion of Tinton Falls, just west of Exit 105 of the Garden State Parkway. The building was constructed during 1971 to 1973 by the plaintiff pursuant to a lease dated August 27, 1971 between plaintiff and the United States of America. The lease agreement provided 535,000 square feet of net usable space for the United States Army Electronics and Material Command (ECOM) and an addendum indicated that an additional 15,860 square feet of net usable space would be provided rent free. (Total occupied by ECOM–550,860 square feet). There is also 44,000 square feet which has remained unfinished and vacant along with approximately 18,000 square feet occupied as a cafeteria.

The basic construction of the building consists of steel frame, reinforced concrete floors and reinforced concrete roof. There are nine fully automatic elevators. The interior has typical office finishes with sheetrock walls, acoustical tile grid ceilings with recessed fluorescent lighting. The floor finishes are asphalt tile, terrazzo and ceramic tiling. Some of the special features, heretofore mentioned, include special floors in the computer rooms, underfloor duct systems, specially designed vaults and vault doors and an auditorium complex on the sixth floor.

To assist in better understanding the problem involved in this matter, it is felt that some background with regard to the formation of the Federal Government lease and the original construction costs is important at this point.

When the Federal Government initially sought office space in 1969 in the Tinton Falls area, the record indicates that Rachlin

and Company formed a group of highly reputed partners in building, design and construction in order to provide the necessary construction and space. The General Services Administration (GSA) of the United States Government supplied a request for proposals which did not provide a definitive plan for building specifications, only the size required was indicated. Within the request it was clear that GSA wanted 535,000 square feet but offerors were notified that offers in excess of $5.50 per square foot would not be considered and no contract award would be made for such offers. The Rachlin Group after extensive investigation and calculations submitted a bid of $5.40 per square foot, then revised it several months later to $5.14 per square foot after GSA agreed to some changes. This project was never developed because of delays by GSA. Thereafter, by a solicitation for offers dated April 19, 1971, GSA again requested proposals with the same square footage requirement and the same limit on price, i. e., 535,000 square feet at not more than $5.50 per square foot. The Rachlin Group developed a bid of $5.35 per square foot but became disenchanted with GSA and did not submit the bid.

It was revealed, however, that there were ultimately two bids received by GSA, one from the plaintiff at $5.33 per square foot and another from Tinton Realty at $5.35 per square foot. The plaintiff received the award and, as previously stated, started and completed construction during the 1971 to 1973 time frame.

The record indicates that the original estimated construction cost was approximately $13,900,000. The actual cost before change orders was $14,589,000 and after the change orders the cost was $18,567,520. It was demonstrated that these costs did not include the "soft" costs involved in construction such as taxes, cost of construction financing, legal fees, architectural and engineering fees, etc., which when added to the "hard" costs produced a total in the neighborhood of $23,000,000.

The land was purchased by the plaintiff at a cost of approximately $10,000 per acre in 1971. The parties did not seriously contest land value since both experts at the rehearing utilized a

value of $400,000 for land. Since there is no dispute and the value is supported by the sale of the subject as testified to by the taxpayer's appraiser and as the existing land assessment does not concededly represent market value, this court will accept and adopt a land value of $400,000.

At the original hearing of this matter, three experts testified as to the market value of the subject. The taxpayer produced an expert who utilized both the income and cost approaches to value but indicated that the most persuasive approach was an income or capitalization analysis. Utilizing the income approach he derived market values ranging from $11,536,600 to $12,696,-200 depending on the use of a different effective tax rate for each year under consideration. At the rehearing this expert stabilized the effective tax rate by applying the average tax rate for the three years in question to the agreed upon average ratio of 78.04%. He also revised his cost estimate to finish the 44,000 square feet of unfinished space. He testified that his value estimate was therefore adjusted to $12,715,000 for all three years.

In his estimate of gross income he opined that the existing leases indicated economic rent. The lease with the United States Government is for a 20 year term starting in 1973 with options to renew for four additional five year periods. The rental specified in the lease was $5.33 per square foot or $2,851,550 annually (535,000 × $5.33). The lease for the cafeteria space indicated a rental of $2.00 per square foot or approximately $40,000 per year based on his estimate of 20,000 square feet. His testimony differed from the taxing district's expert at the original hearing in only two major respects. The taxing district's expert indicated an economic rental of $6.00 per square foot for the ECOM space and $6.50 for all other space and his estimated expenses were $200,000 less than the taxpayer's expert. As such, the Borough's expert gave an indicated true value by the income approach of $17,000,000.

The assessor for the taxing district testified at the original hearing that she had determined the value by the cost approach

using the *Real Property Appraisal Manual for New Jersey Assessors.* (2 ed. 1963). This cost approach improvement value was $16,139,193 which was the value adopted by the Division Judge for both land and improvements. It should be noted that the municipality's appraiser also derived a cost approach value of $16,050,000 at the original hearing while the taxpayer's expert indicated a cost approach improvement value of $12,272,-000.

At the rehearing, a different expert testified on behalf of the municipality. He utilized both the cost and income approaches and arrived at value indications of $21,700,000 by the income approach and $22,500,000 by the cost approach. His correlated final value estimate was $21,700,000 which demonstrated his primary reliance upon an economic analysis as opposed to the reproduction method.

With the exception of the assessor who did not testify as to the income approach because she lacked adequate expense figures, the remaining three experts indicated that the greatest weight should be given to the income approach since any prospective purchaser would consider the net income stream that the subject property was capable of producing and would capitalize that income to determine the price he would pay. The answer to which approach to value should predominate depends upon the facts of the particular matter and the reaction to these factors by the experts. *New Brunswick v. State of N. J., Div. of Tax Appeals,* 39 *N.J.* 537, 544, 189 *A.2d* 702 (1963). The cost approach is normally relied upon to value special purpose or unique structures for which there is no market. The subject is not special purpose nor is it unique despite the difficulties that might be encountered in attempting to market over 600,000 square feet of office space in an area such as Tinton Falls. In this case the income approach presents itself as the proper approach and I find it to be of preponderant influence. *McCrory Stores Corp. v. Asbury Park,* 89 *N.J.Super.* 234, 243, 214 *A.2d* 526 (App.Div.1965); *People ex. rel. Gale v. Tax Comm'n of City of New York,* 17 *A.D.2d* 225, 233 *N.Y.S.2d* 501, 506–507 (App. Div.1962).

■ The major difference between the testimony of the two value experts at the rehearing was with regard to whether the contract rent of the subject constituted economic rent. Contract rent is that rent which is "payment for the use of property, as designated in a lease." *American Institute of Real Estate Appraisers, The Appraisal of Real Estate* (7 ed. 1978) at 325. Economic rent is the "rental warranted to be paid in the open real estate market based on current rentals being paid for comparable space." *Ibid.* There is no doubt that economic rent or fair market rental if it differs from actual or contract rent must control. *New Brunswick v. State of N. J., Div. of Tax Appeals,* 39 *N.J.* 537, 544, 189 *A.*2d 702 (1963); *Parkview Village Assocs. v. Bor. of Collingswood,* 62 *N.J.* 21, 29, 297 *A.*2d 842 (1972). In the event that contract rent is less than economic or fair market rental a leasehold value is created. *American Institute of Real Estate Appraisers, The Appraisal of Real Estate, supra* at 337.

■ In the search for that amount which space should be expected to produce in the current rental market, the actual or contract rent is not to be ignored. *McCrory Stores Corp. v. Asbury Park, supra,* at 243. Indeed, it may be that contract rent is a significant factor in the search for economic income. *Parkview Village Assocs. v. Bor. of Collingswood, supra,* 62 *N.J.* at 30, 297 *A.*2d 842.

The taxing district's expert at the rehearing relied upon 19 office rentals throughout New Jersey ranging in size from 33,658 square feet to 265,000 square feet. After considering all of the comparable rentals and allowing for differences in time, location, size of space rented and special features of the various buildings, he estimated that an economic rental for the subject property of $7.25 per square foot should be applied to the net usable area of approximately 613,000 square feet of the subject. Neither his testimony nor his appraisal report indicated the manner in which adjustments were made for time, location, size, etc. He opined that the comparable rentals established that the contract rent of $5.33 per square foot was well below market for

the subject thereby creating a leasehold value in the Federal Government. He also pointed out that the subject lease was unusual in that it did not provide for any tax or operating cost escalation during the first five years of the lease.

The expert made no allowance for vacancy as to that portion occupied by the government. It was his belief that the government would have paid an economic rental of $7.25 per square foot because it needed the space and that the lease term would exclude any allowance for vacancy.

Defendant now contends that if the subject has an original construction cost in excess of $23,000,000, it must have an economic rental to sustain it of not less than $7.25 per square foot. Manifestly, defendant asserts, cost figures must be given great weight in the determination of an economic rental. The plaintiff answers by stating that cost is not value. He recites the difficulties incurred in preparing the site for construction, the additional costs incurred by the change orders, the underestimation of real estate taxes and operating expenses all of which represent cost but not value. If all had gone as originally planned it was the taxpayer's expert's opinion that the subject could have been constructed by a reputable contractor inclusive of all fees for not over $16,000,000.

■ As was stated in *Bostian v. Franklin State Bank,* 167 *N.J.Super.* 564, 569, 401 *A.2d* 549 (App.Div.1979), the original cost of construction should be considered but it is not controlling. The language from *Bostian* at 570, 401 *A.2d* 549 is appropriate here.

"The utility of cost figures, whether estimated or actual, lies in the fact that they are or may be criteria illuminating the ultimate question of fair market value. For taxation purposes fair market value is the price which could be obtained for the property, in money, at a fair sale between a willing seller not obliged to sell and a willing buyer not obliged to buy. *In re Appeal of East Orange,* 80 *N.J.Super.* 219, 230–31, [193 *A.2d* 377,] certif. den. 41 *N.J.* 200 [, 195 *A.2d* 468] (1963); *Sorokach v. Truesewich,* 35 *N.J.Super.* 86, 89 [, 113 *A.2d* 194] (App.Div.1955); *N.J.A.C.* 18:12–4.8(a). That a building was 'overbuilt', as the assessor and the bank's expert opined this one was, either to satisfy the whim of its owner, or to meet a special purpose, or out of extravagance, does not command the expectation that such an investment will be reflected in the building's fair market value. 84 *C.J.S.* Taxation § 411 at 804. As stated in

*Haworth v. State Board of Tax Appeals,* 132 *N.J.L.* 306, [40 *A.2d* 353] (Sup.Ct. 1944):

Cost is never conclusive on the question of value for tax purposes. Expensive buildings are frequently sold for much less than cost as is common knowledge. [at 308, [40 *A.2d* 353]]

Clearly, the judge of taxation was not obliged as a matter of law to base his determination of true value on the building's actual construction costs."

 Simply because this building was designed principally for the use of a single tenant and there are certain unusual features which may distinguish it from one normally built for general commercial occupancy, I do not find that it is a "specialty" that is, a structure designed for unique purposes to be valued primarily by reference to original cost or by the cost approach. I find that this was implicit in the remanding opinion of the Appellate Division. Fundamentally, our search is for the price at which the property would sell under ordinary circumstances. *New Brunswick v. State of N. J., Div. of Tax Appeals,* 39 *N.J.* 537, 543, 189 *A.2d* 702 (1963). I find in this case, as is generally the case with commercial property, the fair rental value of the premises is the most important factor for consideration in determining true value for tax purposes and I do not believe that original construction costs are entitled to a great deal of weight in the search for economic rental in light of the many difficulties experienced by the plaintiff in the construction of the subject. In this regard the bona fide rental paid by a tenant for his use of the premises is highly significant.

The taxpayer's expert testified at the original hearing and at the rehearing that the contract rent represented economic rent and therefore he utilized $5.33 per square foot rental in his appraisal.

It was his opinion that there was one ingredient that was lacking in the area of Tinton Falls which existed in all of the comparable rentals relied upon by the municipality's expert and that was the demand for space. He felt that if there is a lack of demand it reflects in a loss or impairment of value. Since there was no demand for office space during the applicable periods in Monmouth County and if the subject building were vacant then the Federal Government could have set its own rental terms

when one considers the size of the subject. It was his feeling that the only occupant for the subject would be the United States Government and because there was a large supply and little demand the contract rental would be economic. Hence, the rental is limited in relation to need. When there are substantial vacancies because of a lack of demand, prices move downward adjusting to demand.

Plaintiff produced a licensed real estate broker and vice president of a large commercial brokerage firm in Monmouth County who testified that during the 1974 to 1976 period there was a good deal of office space for rent. He also indicated that his office was unable to attract any major office space tenants to Monmouth County. He opined that demand for office space was meagre in Monmouth County during the 1974 to 1976 time period. He further testified that if 600,000 square feet of office space were offered at $7.25 per square foot during the stated period there would be no takers. There could be rentals at $6.00 per square foot to small users but there would still be vacancies. He concluded by stating that the location of the subject was a hindrance because of unusually heavy traffic conditions and insufficient parking for proposed commercial users.

Defendant further contends that the property must be assessed and valued in the actual condition in which the owner holds it, citing *Colwell v. Abbott,* 42 *N.J.L.* 111, 115 (Sup.Ct. 1880); *Stack v. Hoboken,* 45 *N.J.Super.* 294, 301, 132 *A.2d* 314 (App.Div.1957); *Murphy v. West New York,* 132 *N.J.L.* 111, 115, 39 *A.2d* 38 (Sup.Ct.1944) and *Division of Tax Appeals v. Ewing Township,* 72 *N.J.Super.* 238, 243, 178 *A.2d* 229 (App.Div.1962). It also asserts that the subject is a specially designed and constructed building under a long term lease for a single tenant which must be valued in a manner and by criteria related to the actual use and function of the building itself. Defendant recites that the mere fact that there is little or no rental market for the property because of its size and other characteristics is of no consequence. The property must be valued in the condition in which it is found. The defendant completes its argument on this point by stating that there is a demand for this property, a

demand by the Federal Government for a building which conforms to its own plans and specifications. I agree.

The difficulty with the defendant's position is that it wants the property valued as it is held by the plaintiff, i. e., with the Federal government in almost full tenancy, but seeks to superimpose a rental which the evidence clearly established that the Federal government would not pay. The maximum rental placed by the GSA in its solicitation for offers was $5.50 per square foot. It specifically stated that it would not accept an offer requiring a rental above that. Clearly, there was a demand by the government but it was a demand at not more than $5.50 per square foot for 535,000 square feet, net usable area. It was just as clear that there was a lack of demand for office space by commercial users other than the government. Fundamentally, an excessive supply will result in a reduction of demanded price or excessive vacancies. In the context of this case, I so find. *American Institute for Real Estate Appraisers, The Appraisal of Real Estate* (7 ed. 1978) at 41, et seq.

The plaintiff, however, occupies a unique position in that he can assert that the contract rent is economic rent because there are no similar buildings in size or location and hence no comparable, truly comparable, rentals with which to test the assertion.

However difficult it may be, it is the function of this court to set down in dollars the price which would pass between a willing buyer and willing seller in assumedly perfect bargaining balance. *New Brunswick v. State of N. J., Div. of Tax Appeals, supra*, at 543, 189 A.2d 702.

I find that $5.33 per square foot represents the fair rental value of the subject property so far as can be determined from the competent proofs presented. I base this finding on the following factors.

The lease between the plaintiff and GSA represented a negotiated amount albeit in August, 1971. The evidence indicates that the plaintiff anticipated what rental was necessary for the reasonably foreseeable future within the constraints of the

solicitation for offers (Exhibit P–25) i. e., no bids above $5.50 per square foot would be considered. Other parties did formulate bids within the maximum allowable by GSA specifically the Rachlin Group and Tinton Realty (Each at $5.35 per square foot). Although the Rachlin Group did not submit a bid in 1971, Tinton Realty did.

Economic rental is directly related to the demand for space. The record clearly established that there was little demand for large volume office space in the area of the subject property during the applicable tax years. There was also a clear indication that developers of office space did not seek to provide such space in the subject area because of the lack of demand. There was no evidence that the Federal Government, concededly the only major user of large volume office space in the area, was willing to pay a rental of $7.25 per square foot of net usable area. As a matter of fact an appraiser for the GSA stated that in his opinion that the Federal Government would not have been justified in paying a rental of $7.50 per square foot during the 1974 to 1976 time period.

Further, I find that the taxpayer's expert presented a sounder approach and a more reasonable view as to the value of the plaintiff's property for assessment purposes. In this regard the municipality's appraiser at the initial hearing ascribed an economic rental of $6.00 per square foot to the government occupied space and $6.50 per square foot for the nongovernment and vacant space but had no foundation for these numbers other than his judgment and experience. The opinion of an expert depends upon the facts and reasoning which forms the basis for the opinion. *Passaic v. Gera Mills,* 55 *N.J.Super.* 73, 150 *A.2d* 67 (App.Div.1959), certif. den. 30 *N.J.* 153, 152 *A.2d* 171 (1959). Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard.

At the rehearing, the defendant relied upon the testimony of another appraisal expert. Upon a rather extensive and penetrating cross–examination, the municipality's expert revealed a number of miscalculations with regard to the rental information

which he developed in order to derive his value estimate. It should be stated that he had available to him only one of the actual lease agreements. He relied for the most part upon information given to him by representatives of owners, tenants, other appraisers and rental agents. One of the lease agreements did not exist and another was for warehouse space primarily. He was unaware of any real estate brokerage commissions and rental concessions given by a landlord to a tenant relative to the comparable rentals.

His physical inspections were all from the exterior of the comparable properties. It was demonstrated that he viewed the wrong building relative to two of his comparables. Certain rentals described as "net–net" were not as indicated and certain lease execution dates were not as indicated. He testified that he had made adjustments for the special features contained in the comparable buildings yet did not inspect the interiors of these comparables in order to view the special features. Additionally, he did not attempt to make the court aware of the manner in which he made adjustments for time, location and size of the comparables. I am unable to test these mental allowances unless an explanation is provided.

It was also clear that he made no attempt to assess the demand for office space in Tinton Falls or Monmouth County. He did not because he felt that there was a demand for practically the entire building for use as office space. This demand was manifested by the need of the Federal Government to occupy the improvement in its present shape and form in accordance with the plans and specifications as provided in the original lease.

As a result of the foregoing observations, I do not give much weight to the testimony of the expert for the municipality as to the gross annual potential income of the subject property.

For the reasons given, I accept the economic rental to be $5.33 per square foot for all of the net usable space. I cannot accept the opinion of the taxpayer's expert of $2.00 per square foot as reflecting economic rental for the cafeteria portion of the build-

ing. I cannot accept a rental for this space which is barely above warehouse space rental. I can only conclude that the existing lease in this regard does not correctly reflect economic rent. I find that economic rent for this portion should be not less than the rental for the balance, i. e., $5.33 per square foot. There was a difference between the experts as to the amount of net usable area and I find the taxing district's expert's testimony in this regard more convincing than that of the taxpayer's expert, therefore, I accept the amount of net usable area as being 612,860 square feet. It should be noted that this was not disputed by the taxpayer or his expert.

There will be no allowance for vacancy except for the cafeteria space. I find support for this conclusion in the record by the testimony of the taxpayer's expert who assumed that the only tenant for the additional unfinished space would be the Federal Government at a rental commensurate with the already occupied government space. I find, however, in accordance with the testimony of the two appraisal experts for the taxing district that an allowance of 10% should be made for the nongovernmental cafeteria space. I find this vacancy and collection loss factor to be fair and reasonable under the circumstances.

There was no dispute by the experts at the rehearing as to the expenses attributable to the operation of the subject, therefore, I will accept the sum of $1,287,500 as constituting a fair and reasonable allowance. The parties did not seriously differ in the capitalization rate, therefore, I will utilize the building residual method to capitalize the net income and will accept the taxpayer's expert's capitalization rate of 10.5% reflecting 8.5% for return on investment and 2% for recapture of investment. I find these rates to be fair and reasonable and not in contention. To this rate I will add an undisputed effective tax rate of 3.58% which represents the average tax rate for the Borough for the three tax years in question multiplied by the average ratio of 78.04%.

Additionally, there was no dispute by the experts at the rehearing that the cost to finish 44,000 square feet which has remained unfinished and vacant would be $400,000. Since this

space has been included in the overall estimate of gross annual rent the cost to finish must be deducted from the value of the improvement.

I have already indicated that the land value will be $400,000 based upon the testimony of the taxpayer's expert and the acceptance of the same value by the municipality's expert.

Reconstructing the income approach pursuant to the foregoing, I find as follows:

| | |
|---|---:|
| Gross Annual Rent | |
| 612,860 sq. ft. at $5.33 per sq. ft. | $ 3,266,544 |
| Less Vacancy and Credit Loss for nongovernment cafeteria space | |
| (18,000 sq. ft. × $5.33 per sq. ft. × 10%) | 9,594 |
| Effective Gross Income | $ 3,256,950 |
| Less Operating Expenses | 1,287,500 |
| Net Income | $ 1,969,450 |
| Deduct income to land | |
| ($400,000 × 12.08%) | |
| (8.5% return + 3.58% tax) | 48,320 |
| Net Income to Improvements | $ 1,921,130 |
| $1,921,130 capitalized at 14.08% | |
| (8.5% return 2% recapture and | |
| 3.58% tax) (rounded) | $13,644,400 |
| Less Cost to prepare 44,000 | |
| sq. ft. of unfinished space | 400,000 |
| Value of the improvement | $13,244,400 |
| Add Value of Land | 400,000 |
| Value for 1975 & 1976 | $13,644,400 |

The improvement value for 1974 representing a completion level of 70% shall be $9,271,100. Adding the land value for 1974 produces a total value of $9,671,100.

Pursuant to the understanding of the parties the Director of the Division of Taxation's sales–assessment ratios averaged for

the three tax years in question shall be applied to the true value determination. Applying this ratio of 78.04% to true value, I will direct the entry of judgments by the Clerk of the Tax Court as follows:

| 1974 | | 1975 & 1976 | |
|------|------|------|------|
| Land | $ 312,200 | Land | $ 312,200 |
| Improvements | 7,235,200 | Improvements | 10,335,900 |
| Total | $7,547,400 | Total | $10,648,100 |