TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1st Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

January 11, 2019

James Esposito, Esq.
Spiotti & Esposito, P.C.
271 US Highway 46
Suite F105-106
Fairfield, New Jersey 07004

John P. Miller, Esq.
Weiner Law Group, LLP
629 Parsippany Road
Parsippany, New Jersey 07054

Re:     Rafael & Allsion J. Ortiz v. Rahway City
         Docket Nos. 012578-2013, 012969-2014, 010122-2015, 012030-2016

Dear Mr. Esposito and Mr. Miller:

This letter opinion constitutes the court's decision following trial in the above-referenced matters. Plaintiffs, Rafael and Allsion J. Ortiz, challenge the local property tax assessments on their single-family residence for the 2013, 2014, 2015, and 2016 tax years.

For the reasons stated more fully below, the court affirms the local property tax assessments for the 2013, 2014, 2015, and 2016 years.

I. **Procedural History and Factual Findings**

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony adduced during trial.

1

Rafael and Allsion J. Ortiz ("taxpayers") are the owners of the single-family residence located at 1027 West Lake Avenue, in the City of Rahway, County of Union, and State of New Jersey (the "subject property"). The subject property is identified on Rahway City's municipal tax map as Block 115, Lot 5.021. For the 2013, 2014, 2015, and 2016 years, the subject property bore the following tax assessment:

| | |
|---|---|
| Land: | $140,000 |
| Improvements: | $478,400 |
| Total | $618,400 |

The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for Rahway City ("defendant") was 51.53% for the 2013 tax year, 53.78% for the 2014 tax year, 57.89% for the 2015 tax year, and 58.09% for the 2016 tax year. See N.J.S.A. 54:1-35a(a). When the average ratio is applied, the subject property's implied equalized value was: $1,200,078, or $115.99 per square foot, for the 2013 tax year; $1,149,870, or $111.14 per square foot, for the 2014 tax year; $1,068,233, or $103.25 per square foot, for the 2015 tax year; and $1,064,555, or $102.90 per square foot, for the 2016 tax year.

Taxpayers filed Petitions of Appeal challenging the subject property's 2013, 2014, 2015, and 2016 local property tax assessments with the Union County Board of Taxation (the "Board"). The Board entered Memorandums of Judgment affirming the assessments (the "Judgments"). Thereafter, taxpayers timely filed complaints with the Tax Court challenging the Judgments.

At trial, taxpayers offered testimony from a State of New Jersey certified residential real estate appraiser, who was accepted by the court, without objection, as an expert in the field of residential property valuation (the "expert"). The expert prepared appraisal reports expressing an opinion of market value for the subject property as of each valuation date. The appraisal reports

2

were admitted into evidence, also without objection. The defendant did not offer testimony from any appraiser or fact witness.

Based upon the evidence presented, the court concludes that the subject property is a two-story colonial-style, single-family residence constructed in 2011, situated on a .91 acre, or 39,640 square foot flag lot. The home contains a gross living area of approximately 10,346 square feet, consisting of 7 bedrooms, 4 full bathrooms, 1 half bathroom, 2 laundry rooms, an elevator, a kitchen and dinette area, a family room, a dining room, a living room, an office, a 2nd floor family room, and an attached three-car garage.[1] The home also includes an attached accessory dwelling unit ("ADU") with a separate entrance that contains 1 bedroom, 1 full bathroom, a kitchenette, a living room, and a laundry area.[2] The basement of the home is generally unfinished, however a portion of the basement area includes a 1,729 square foot gymnasium-like two-story recreation area/rehabilitation room constructed of concrete block walls, a concrete floor, and contains elevated windows.[3] The residence contains two fireplaces, a deck, and a small rear patio area. The home is serviced by forced air heating and cooling systems. The home was constructed by, or on behalf of, the taxpayers for the personal use of their family.

Although the taxpayers' single-family residence is sizeable, the interior photographs depict a modestly appointed home, that is neither opulent, nor lavish.[4] The main entrance of the

---

[1] One of the full bathrooms is apparently designed to accommodate users with disabilities or limited mobility.

[2] During the last six months of 2016, the taxpayers offered the ADU for rent on a local real estate multiple listing service. According to the expert, the ADU was not rented, but rather was thereafter occupied by members of taxpayers' extended family.

[3] Photographs of the recreation area/rehabilitation room depict a basketball hoop and backboard, and trampoline.

[4] The expert described the construction and interior finishes as "vanilla" and "generic."

home consists of a two-story foyer with hardwood flooring and a wooden staircase leading to the second floor. Adjacent to the foyer is the dining room, a hallway leading to the kitchen, and a door leading to one of the seven bedrooms. The kitchen is galley-style, with stainless steel appliances and upper and lower wood or wood-like cabinets. The interior walls are composed of painted sheetrock with base and crown moldings. The home has hardwood flooring throughout and ceramic or natural stone tile flooring in the bathrooms. Illumination in the home is provided by recessed lighting in the kitchen, family room, dinette, and hallways, a chandelier in the foyer and dining room, and ceiling fans with lights in the bedrooms. In addition, the exterior of the home is finished on all sides with solid red brick, with portions of the front second floor siding finished with a stucco exterior insulation and finish system.[5]

The expert offered his opinion that the subject property had a true market value as follows:

| 10/1/2012 | 10/1/2013 | 10/1/2014 | 10/1/2015 |
|-----------|-----------|-----------|-----------|
| $795,000  | $805,000  | $850,000  | $850,000  |

## II. Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See

---

[5] The expert offered credible testimony that the taxpayers constructed their home in Rahway because it is both where they were from, and where they maintain their businesses.

Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the taxpayers' proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)). Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the party challenging the tax assessment has overcome the presumption of validity. If the court concludes that a challenging party has not carried the requisite burden, dismissal of the action is warranted under R. 4:40-1 and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

According taxpayers all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that the taxpayers produced cogent evidence sufficient

to overcome the presumption of validity. If accepted as true, the opinions of the expert and the facts upon which the expert relied raise debatable questions regarding the correctness of the subject property's 2013, 2014, 2015, and 2016 tax year assessments.

Nonetheless, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer. . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15.

B. Highest and Best Use

"For local property tax purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The determination of the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). Here, the expert opined that the highest and best use of the subject property was its existing use as a single-family residence. The court accepts the expert's conclusion that the highest and best use of the

6

subject property is its current use as a single-family residence.

C. Valuation

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); see also ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Glen Rock Borough, 19 N.J. Tax 366, 376 (App. Div. 2001). "[T]he answer as to which approach should predominate depends upon the facts in the particular case." WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986).

1. Discussion

Here, the expert considered all three approaches to value however, in his opinion, the cost approach produced the best evidence of market value. Although the sales comparison approach is generally viewed as the preferred method for valuing single-family residences, in the expert's opinion, it was not a reliable indicator of value due to the home's size, reasoning that he would have had to apply percentage adjustments that he did not believe would be found acceptable by the court.[6]

The cost approach derives a property's value "by adding the estimated value of the land to

_____

[6] The sales comparison approach is predicated upon an evaluation of market transactions involving the recent sale of similar properties. This approach involves a "comparative analysis of properties" and requires the expert to focus on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." Appraisal Institute, The Appraisal of Real Estate, 378 (14th ed. 2013).

the current costs of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (i.e., deterioration and obsolescence) in the structures from all causes." Appraisal Institute, The Appraisal of Real Estate, 47 (14th ed. 2013). Thus, the cost approach consists of "two elements - land value and the reproduction or replacement cost of the buildings and other improvements." International Flavors & Fragrances, Inc. v. Union Beach Borough, 21 N.J. Tax 403, 417 (Tax 2004).

In performing his cost approach, the expert identified seven residential land sales he considered reflective of the subject property's land value. Three sales were used to derive a value for the 2013 and 2014 tax years, and four sales were used to derive a value for the 2015 and 2016 tax years. Two out of the seven sales involved the identical property, which sold and was then resold within a 90 day period. The seven sale transactions took place between September 2012 and September 2014, and were all located in Rahway. The land sales ranged in size from 6,000 square feet, or 0.14 acres, to 12,000 square feet, or 0.275 acres, and had unadjusted sale prices from $8.00 to $15.00 per square foot, or $348,480 to $653,400 per acre.

The expert applied a series of adjustments to the land sales to account for perceived differences in location (-30% to -20%), and land size (-30% to -20%). To support his location adjustments the expert performed a paired sale analysis of eight single-family residences in Rahway that sold on "busy street[s]" and "typical less busy street[s]." The expert employed three paired sales for the 2013 and 2014 tax years, and five paired sales for the 2015 and 2016 tax years. The resulting range of adjustments were from -50% to -30%, and the net adjusted values were $4.80 to $8.75 per square foot, or $209,088 to $381,150 per acre. The expert concluded a land value of $6.25 per square foot, or $272,250 per acre, and an overall land value for the subject property of $250,000 ($6.25 x 39,640 square feet = $247,750) for the 2013 and 2014 tax years,

and a land value of $7.00 per square foot, or $304,920 per acre, and an overall land value of $275,000 ($7.00 x 39,640 square feet = $277,480) for the 2015 and 2016 tax years.

In order to generate the replacement cost new of the improvements on the subject property, the expert employed the Marshall & Swift Valuation Service's Cost Manual (the "Cost Manual"). The expert categorized the home into five sections: (i) 3,871 square feet, average quality, Class D Masonry Veneer (living areas); (ii) 195 square feet, average quality, Class D Masonry Veneer (entrance foyer); (iii) 6,280 square feet, average quality, Class D Masonry Veneer (living areas); (iv) 4,299 square feet, average quality, Class D (basement); and (v) 1,729 square feet, average quality, Class D (recreation area/rehabilitation room).[7] Next, the expert derived a value for the elevator, ADU kitchenette, fireplaces, garage, deck, porch, and entrance canopy, which he categorized in his report as "Total Lump Sums."

After determining the applicable unit costs and applying story, floor area, current cost, local and high-value residence multipliers, the expert concluded a total structure cost new, inclusive of the Total Lump Sums, of: (i) $1,467,237, for the 2013 tax year; (ii) $1,500,046, for the 2014 tax year; (iii) $1,552,878, for the 2015 tax year; and (iv) $1,580,411, for the 2016 tax year.

---

[7] The Cost Manual classifies average quality, Class D Masonry Veneer as "Brick veneer, some trim, wood or good asphalt shingles." The Marshall & Swift Valuation Service further classifies "Masonry Veneer" as including block veneer and brick veneer, and defines "brick veneer" as "brick facing (clay) applied to a stud framed structure to give it the appearance of a solid brick structure." Conversely, "brick, solid" is classified by the Marshall & Swift Valuation Service as "Masonry Walls," and is defined as "a masonry wall structure comprised of common clay bricks only. Typically two or more rows thick, with each row grouted together." Here, the expert offered testimony that the exterior of the subject property was composed of solid brick and not brick veneer facing. Thus, questions arose with respect to the appropriateness of the expert's classification of the subject property as Class D Masonry Veneer, and correspondingly, the replacement cost assigned thereto.

The expert then added a value for "site improvements" of $100,000, "soft costs" of 5%, and "entrepreneurial profit" of 10%.[8]  Finally, the expert applied a 70% depreciation rate, attributing 20% depreciation to functional obsolescence, and 50% depreciation to economic/external obsolescence.  Admittedly, the expert acknowledged that his 70% depreciation rate was "a very large deduction."  Moreover, in attempting to reconcile the largess of the applied depreciation rates, the expert opined that the subject property is located on a "very busy road" and due to its size, the home was an "over-improvement" in Rahway, suffering from "superadequacy."  The expert further expressed that the home suffers from functional obsolescence as a result of "specialty items being fit-up for [taxpayers'] 'special needs' children."  Finally, the expert offered that because this home was constructed in Rahway, and without certain opulent and lavish features customary to homes this size in the surrounding communities, in the expert's opinion a large depreciation factor had to be applied based on "the way it [the home] should be built. . ."[9]  Application of the expert's 70% depreciation rate resulted in a reduction in the reproduction cost new of the taxpayers single-family residence of between $1,267,111 to $1,358,612.

---

[8]  The expert explained that the "site improvements" include landscaping and driveway paving.  However, the expert expressed that the $100,000 allocated for site improvements is "more of an educated net opinion based on the property type [and] my experience."  The expert also explained that the "soft costs" include his estimates for administrative costs, professional fees, financing costs interest on construction loans, builder's all-risk insurance and sales and lease-up costs.  Finally, according to the expert, Entrepreneurial Profit "tend[s] to be anywhere from 5% to 15%, in my experience, for residential, I selected 10% which seems to be appropriate for this property type. . ."  Additionally, the expert's report states that "[o]ur analyses of numerous comparable sales reflect developers in the subject market realize entrepreneurial profit from 5% to 15%."

[9]  According to the expert the subject property's foyer was "not the typical grand foyer entrance that you would . . . see of a property this size."  Similarly, the expert expressed that "typically new construction and especially with builds of this . . . size all bedrooms should [contain] en-suites . . . this isn't at all achieved in this home."

In sum, the expert concluded a depreciated replacement cost new for the taxpayers single-family residence of: (a) $543,048, as of the October 1, 2012 valuation date; (b) $554,416, as of the October 1, 2013 valuation date; (c) $572,722, as of the October 1, 2014 valuation date; and (d) $582,262, as of the October 1, 2015 valuation date.

To the depreciated replacement cost new of the single-family residence, the expert added his computed land value. This resulted in an overall value conclusion of: (a) $795,000, or $76.84 per square foot ($543,048 + $250,000 = $793,048), as of the October 1, 2012 valuation date; (b) $805,000, or $77.81 per square foot ($554,416 + $250,000 = $804,416), as of the October 1, 2013 valuation date; and (c) $850,000, or $82.16 per square foot ($572,722 + $275,000 = $850,000), as of the October 1, 2014 valuation date; and (d) $850,000, or $82.16 per square foot ($582,262 + $275,000 = $857,262), as of the October 1, 2015 valuation date.

2. Conclusion

Although the cost approach is a recognized and accepted approach for property valuation, it is not the favored approach for discerning the market value of single-family residential property. Generally, the comparable sales approach is viewed as the most appropriate method of estimating the value of a single-family residence. Brown v. Glen Rock Borough, 19 N.J. Tax at 377; Greenblatt, 26 N.J. Tax at 53. However, the cost approach can be useful for discerning a property's market value if the site improvements are newly constructed, distinctively opulent, contain unique or special features, or other amenities that are not generally present in other like properties. Little Ferry Borough v. Vecchiotti, 7 N.J. Tax at 407, aff'd, 180 N.J. Super. 366 (1981); see also Transcontinental Gas Pipe Line Corp. v. Bernards Twp., 111 N.J. 507 (1988). The cost approach is often the only reliable method of valuation of "special purpose or unique structures for which there is no market." Dworman v. Tinton Falls Borough, 1 N.J. Tax 445, 452 (Tax 1980);

11

Glenpointe Associates v. Teaneck Twp., 10 N.J. Tax 380, 388 (Tax 1989), aff'd, 12 N.J. Tax 118 (App. Div. 1990).

"Special purpose property is most easily understood in terms of property that 'cannot be converted to other uses without large capital investment,' such as a public museum, a church, or a highly-specialized production facility like a brewery." Ford Motor Co., 127 N.J. at 298-99 (internal citation omitted). Generally, a special purpose property will possess the following characteristics: "(1) unique and specially built for the purpose for which they are used, (2) without a market or comparable sales, (3) unlikely to be converted without substantial economic expenditure, and (4) reasonably expected to be replaced or reproduced if destroyed." TD Bank v. Hackensack City, 28 N.J. Tax 363, 379 (2015).

Here, the expert classified the subject property as a "special use property," advocating for use of the cost approach because, in his view, the subject property's house is "an over-improvement." He contended that because of the "relatively unique or specialized improvements . . . for which there exist no comparable properties on the market," the cost approach is the most effective mechanism to value the subject property. According to the expert, the presence of certain distinct features in the home, and the lack of others, accounts for functional and economic/external obsolescence, for which there is no market.

The court rejects the expert's contention that the subject property is a special purpose property. The subject property is a single-family residence and is not so uniquely designed and specially built that no market exists for it. As evidenced by the expert's paired sales analysis, a market exists in Rahway for newly constructed single-family residences. Moreover, a property "does not qualify as a specialty where it possesses certain features which, while rendering the property suitable to the owner's use, are not truly unique." TD Bank, 28 N.J. Tax at 380. Here,

the court observes that the subject property may possess certain distinct features that are not customary to single-family residences in Rahway (i.e. elevator, handicap accessible bathroom, and recreation/rehabilitation room).  However, the mere presence of these features make the subject property more suitable for the taxpayers use, and does not render it so unique that it constitutes a special purpose property.  Additionally, no testimony was adduced during trial that the subject property would require any substantial economic expenditures or renovations to enable another owner to use the property as a single-family residence, or that the single-family residence would reasonably be expected to be replaced as it was constructed if it was destroyed.  Id. at 379.

In addition, the court finds that a lack of support exists in the record for the expert's application of a 20% depreciation rate for functional obsolescence.  "'Functional obsolescence' is a term used to describe the diminution of a building's market value resulting from the fact that it contains costly features which were installed to gratify the owner or which are unique to the special purpose of the building but which do not enhance its value on the market."  CPC Int'l, Inc. v. Englewood Cliffs, 193 N.J. Super. 261, 265 (App. Div. 1984).  "A building that was functionally adequate at the time of construction can become inadequate or less appealing as design standards, mechanical systems, and construction materials evolve."  The Appraisal of Real Estate, at 623.  Functional obsolescence can also be the result of "superadequacy, which means that some aspect of the subject property exceeds market norms."  BASF Corp. Coating & Ink Div. v. Belvidere Town, 23 N.J. Tax 551, 571 (Tax 2007), aff'd, 24 N.J. Tax 416 (App. Div. 2009).  The test for functional obsolescence "is whether the features claimed for functional obsolescence are non-utilitarian to the point that the recovery of their cost in an open sale can only be premised on the expectation of a wantonly extravagant buyer or one having the same unique requirements as the owner."  CPC Int'l, Inc., 193 N.J. Super. at 266-267.

13

Our courts have consistently adopted the view that "no allowance will be made for the special purpose character of the building or for overbuilt features where the original owner erected the buildings for his own needs, remains in possession, and continues to enjoy the improvements which it installed and for which the allowance is claimed." CPC Int'l, Inc., 193 N.J. Super. at 269; see also Turnley v. Elizabeth City, 76 N.J.L. 42 (Sup. Ct. 1908) (concluding that although there may be "very few actual buyers for so costly a residence . . . [it does not necessarily dictate that] . . . the valuation to be placed upon it under the statutory criteri[a] should be correspondingly depreciated."). Thus, a deduction allowance for functional obsolescence should be rejected when a property has a market and utility with its owner, because it is being used for the purposes for which it was intended or designed.

Here, the subject property is a single-family residence designed for and used by the members of the taxpayers' large family. The taxpayers and their family live in the subject property and continue to use and derive benefits and enjoyment from the installed features. No evidence or testimony was presented that any parts or distinct features of the home were unused by the taxpayers' family. To the contrary, the evidence adduced during trial demonstrates that the elevator, handicap accessible bathroom, and recreation/rehabilitation room are regularly used by taxpayers and their family. Moreover, the record contains no credible evidence that these distinct features are so impractical and useless that recovery of the costs expended by the taxpayers in their installation requires finding "a wantonly extravagant buyer . . . having the same unique requirements as the owner." CPC Int'l, Inc., 193 N.J. Super. at 266-267. The mere installation and presence of these distinct features in a single-family residence does not lead the court to inexorably conclude that they are non-utilitarian and superadequate, suffering from functional obsolescence.

14

The court further finds that a lack of adequate support exists in the record for the expert's 50% depreciation rate for economic/external obsolescence. External, or economic obsolescence, is "a loss in value caused by negative externalities, i.e., factors outside a property." The Appraisal of Real Estate, at 632; see also BASF Corp. Coating & Ink Div., 23 N.J. Tax at 580. It is "the loss in value attributed to external influences allocated to the building improvements," such as adverse economic conditions. Id. at 633. This form of obsolescence can be either temporary or permanent. External obsolescence "usually has a market wide effect and influences a whole class of properties, rather than just a single property." Id. at 632. Factors outside of the property itself may include: "changes in population characteristics and economic trends, excessive taxes, and governmental restrictions." Transcontinental Gas Pipe Line Corp., 111 N.J. at 541.

In support of his depreciation for economic/external obsolescence, the expert cites, as the bases for his deduction, that the subject property's home was an "over-improvement" in Rahway. As substantiation for his 50% depreciation rate, the expert performed a paired sales analysis of newly constructed homes in Rahway and newly constructed homes in the communities surrounding Rahway. However, the paired sales analysis performed by the expert demonstrates the market's reaction to a property's location, not necessarily the market's reaction to building size. The expert offered no data or evidence demonstrating that a single-family residence that is over-built in a taxing district will experience 50% economic/external obsolescence. The expert offered no evidence of other sales either in Rahway, or in any of the surrounding communities demonstrating how an alleged newly constructed and over-improved home experienced depreciation of 50% upon sale. Thus, although the court acknowledges that the home on the subject property may be substantially larger than other single-family residences in the Rahway community, the expert's testimony failed to demonstrate how such alleged detriment should be

15

measured in determining the subject property's true market value.[10]

Moreover, in considering the depreciation rate which should be applied to the subject property, the expert explained that he "utilized the overall construction and the obsolescence of the construction of the home . . . the overall quality, the lack of amenities" in the subject property. According to the expert, the home "isn't constructed in the overall . . . the way it should be built, in my opinion, and once that house has these features, has those amenities, has those quality of construction items," the costs associated with installation of more luxurious features under the Cost Manual would account for a "20% to 50% of difference" in cost. Thus, he applied a 50% depreciation rate for economic/external obsolescence. "External obsolescence may be estimated by allocation of market-extracted depreciation, market data analysis, or capitalization of income loss." Regent Care v. Hackensack City, 27 N.J. Tax 138, 156 (Tax 2013). Here however, the expert's economic/external obsolescence conclusions were based on his subjective and unsupported opinions of the features, amenities, and opulence that a residence this size must contain in the communities surrounding Rahway to render it marketable. The expert offered no market-extracted depreciation rates, or data analysis supporting his 50% depreciation rate. Instead, the expert's depreciation rate was based on the expert's perceived notions of the features that residences this size should contain and the cost differences associated with the installation of the features the expert believes that they should contain. When an expert fails to establish a valid basis for the deduction of economic obsolescence, the court may decline accept a deduction for it. See American Cyanamid Co. v. Wayne Twp., 17 N.J. Tax 542, 568 (Tax 1998).

Here, the expert offered no actual data or economic evidence demonstrating that single-

---

[10] The three Rahway new home sales relied on by the expert in his paired sales analysis reflected a market value of $156.13 to $164.05 per square foot. The subject property's equalized fair market value during the tax years at issue was $102.90 to $115.99 per square foot.

family residences this size in the Union County marketplace that are "over-built" or that lack certain lavish features and amenities will experience a 50% diminution in value. Moreover, the expert submitted no evidence that the costs associated with construction of these distinct features directly correlates into market value. When an expert offers inadequate explanation for the basis of an opinion, the opinion is entitled to little weight. Dworman, 1 N.J. Tax at 458. Accordingly, for the above stated reasons, the court accords the expert's 20% depreciation rate for functional obsolescence and 50% depreciation rate for economic/external obsolescence little weight.

Finally, although the expert's report includes "site improvements" and "soft costs" ranging from $178,362 to $184,020.54 in determining the subject property's value, no itemization, data, or market support for these estimated costs are contained in the appraisal reports, or in the expert's testimony. Soft costs or indirect costs are "expenditures or allowances are necessary for construction but are not typically part of the construction contract." The Appraisal of Real Estate, at 387. These include architectural and engineering services, loan origination fees, carrying costs during construction, title insurance fees, appraisal and legal fees, leasing and marketing costs, and developer's overhead and Profit." Ibid. Admittedly, the expert acknowledged during his testimony that his site improvements were "more of an educated net opinion based on the property type [and] my experience." However, because the expert offered no market data or statistics to the court in support of these amounts, and his explanation that these amounts were based on his subjective experience, the court is unable to gauge the reasonableness or propriety of these sums.

Thus, without adequate market derived data to support the expert's depreciation rates for functional and economic/external obsolescence, and without adequate support for the expert's site improvements and soft cost estimates, the court finds that the expert's concluded replacement costs

17

and correspondingly, cost approach, does not produce a credible estimate of market value for the subject property.

### 3. The Glen Wall dilemma

Nonetheless, the court is mindful of its obligation "to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates v. Wall. Twp., 99 N.J. 265, 280 (1985) (citing New Cumberland Corp. v. Roselle Borough, 3 N.J. Tax, 345, 353 (Tax 1981)). However, to enable the court to make an independent finding of true value, credible and competent evidence must be adduced in the trial record. Here, the court was presented with inadequate data and supporting analysis for the expert's depreciation rates, site improvements and soft costs. The court's independent determination of value must be based "on the evidence before it and the data that are properly at its disposal." F.M.C. Stores Co. v. Morris Plains Borough, 100 N.J. 418, 430 (1985). The court concludes that as a result of these inadequacies, the trial record contains insufficient credible evidence for this court to make an independent determination of the true market value of the subject property by a fair preponderance of the evidence.

## III. Conclusion

The court concludes that the taxpayers have failed to prove, by a fair preponderance of the evidence, that the subject property's local property tax assessment for the 2013, 2014, 2015 and 2016 years exceed its true market value. Accordingly, the court shall enter judgments affirming the subject property's local property tax assessments.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.


18